# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

DANIEL FERNANDEZ,                      )    1:07-CV-01278-OWW JMD HC
                                       )
               Petitioner,             )    FINDING AND RECOMMENDATION
                                       )    REGARDING PETITION FOR WRIT OF
     v.                                )    HABEAS CORPUS
                                       )
DARRAL ADAMS,                          )    OBJECTIONS DUE WITHIN THIRTY (30)
                                       )    DAYS
               Respondent.             )
_____ )

**Procedural History**

On February 11, 2004, a jury convicted Petitioner of first degree murder and found true the special circumstances that the murder occurred during the commission of a burglary and robbery where Petitioner personally and intentionally discharged a firearm.  (See Respondent ("Resp't") Lodged 4.)  In a bifurcated proceeding, the trial court additionally found Petitioner guilty of felony possession of a firearm, and that Petitioner had a prior strike conviction pursuant to California Penal Code § 667(b)-(I), a prior serious felony conviction (§ 667(a)), and had served one prior prison term (§ 667.5(b)).  (See Resp't Lodged 4.)  The trial court imposed a term of twenty-five years to life for the murder and its enhancements, and a consecutive term of five years for the prior serious felony enhancement.  (See Resp't Lodged 4.)  The trial court additionally imposed a concurrent term of four years consisting of the middle term for the felony possession of a firearm, doubled pursuant to California's Three Strikes Law.  (See Resp't Lodged 4.)

On October 18, 2005, in its opinion following Petitioner's direct appeal, the California Court of Appeal directed the trial court to issue an amended abstract of judgment to reflect Petitioner's presentence credit of 734 days actually served and stay the Penal Code Section 667.5(b) enhancement.  (See Resp't Lodged 4.)  In all other respects, the Court of Appeal affirmed the judgment.  (See Resp't Lodged 4.)

Petitioner filed a petition for review in the California Supreme Court on November 23, 2005.  (See Resp't Lodged 6.)  The California Supreme Court denied the petition for review on February 1, 2006.  (See Resp't Lodged 8.)

Petitioner filed a petition for writ of habeas corpus in the California Court of Appeal on October 28, 2005.  (See Resp't Lodged 5.)  The Court of Appeal denied the petition without prejudice to Petitioner filing a petition for writ of habeas corpus in the Superior Court on December 19, 2005.  (See Resp't Lodged 7.)

Petitioner filed a second petition for writ of habeas corpus in the California Superior Court on February 6, 2006,  raising all eleven claims currently before this Court.  (See Resp't Lodged 9.)  The Superior Court denied the petition in a reasoned decision on February 9, 2007.  (See Resp't Lodged 10.)

On March 6, 2007, Petitioner filed a petition for writ of habeas corpus in the California Court of Appeal.  (See Resp't Lodged 11.)  On March 19, 2007, the Court of Appeal denied the petition without comment.  (See Resp't Lodged 12.)

On April 5, 2007, Petitioner filed a petition for writ of habeas corpus in the California Supreme Court.  (See Resp't Lodged 13.)  On August 15, 2007, the court denied the petition without comment.  (See Resp't Lodged 14.)

Petitioner filed the instant petition for writ of habeas corpus in the United States District Court, Eastern District of California on September 4, 2007.  Petitioner filed an amended petition for writ of habeas corpus on February 19, 2008.[1]  Respondent filed an answer on May 24, 2010.[2]

---

[1]The Court's August 15, 2008, order initially dismissed Petitioner's amended habeas petition for formating deficiencies but ordered any request for a Certificate of Appealability granted because reasonable jurists could differ as to the Court's ruling. Petitioner appealed to the Ninth Circuit Court of Appeals which vacated the judgment and remanded for consideration of Petitioner's claims on September 28, 2009.  On February 5, 2010, the Court ordered Respondent to file a Response to

**Factual Background**

The Court adopts the California Court of Appeal's summation of the facts surrounding Petitioner's crime and conviction:

> Surjit Singh, a clerk at a convenience market, was shot and killed as someone stole two 18-packs of beer. Appellant was charged and convicted of first degree murder with the special circumstances that the murder occurred during the commission of a robbery and a burglary. Rudy Fernandez (Rudy), who was appellant's cousin, and their friend Jorge Montanez (Montanez) were originally charged with the same offense, but they pleaded guilty to second degree robbery and testified for the prosecution at appellant's trial.
>
> On appeal, appellant argues the trial court improperly allowed the jury to hear his brother, Arthur Fernandez, refuse to testify and claim his Fifth Amendment rights. Appellant also asserts the court improperly instructed the jury to resume deliberations when the special circumstance findings were not clear, the court improperly imposed a term for the firearm enhancement in addition to his indeterminate life term, and that his actual days of presentence custody were incorrectly calculated. We will correct the calculation of actual presentence custody days and otherwise affirm.

**The Murder**

> At approximately 11:45 p.m. on Friday, November 23, 2001, Surjit Singh (Surjit) and Mohinder Singh (Mohinder) were working as sales clerks at the Quick Stop market in Tulare. The two clerks were not related. A Hispanic male entered the market and briefly spoke with Surjit. The man walked to the beer display and picked up two 18-packs of beer. He asked Surjit if he could buy the beer on credit, and Surjit said no. The man ran out of the market without paying for the beer.
>
> Surjit shouted to Mohinder that the man ran out with the beer. Surjit jumped over the counter and followed the man into the parking lot. Mohinder followed Surjit and ran out of the market. As Mohinder turned around the corner of the building, he saw a car parked next to the dumpster. Surjit was between Mohinder and the car. Mohinder believed the man who took the beer entered the car. Another man was standing next to the passenger side, and looked up at Mohinder. Mohinder heard six or seven gunshots fired from the car, and watched as Surjit's body spun around. Surjit tried to get back into the market but collapsed in the parking lot, in front of the market's entrance. The car sped away. Mohinder went into the market to call for help but Surjit died at the scene.
>
> At trial, Mohinder admitted that when he was interviewed at the scene, he might have made inconsistent statements and told the police that he did not leave the market. Mohinder explained, however, that he meant that he did not leave the market again after Surjit was shot. Mohinder did not speak English, and his nephew acted as the interpreter when the police interviewed Mohinder that night. The nephew testified that Mohinder was very nervous and upset, and calmed down about six hours later.

---

Petition.

[2]On November 17, 2010, the Court granted Petitioner's request for an extension to file a traverse and ordered the document to be filed by December 7, 2010. Petitioner has not filed a timely traverse to Respondent's answer.

Tina Garcia had been driving past the market's parking lot when she noticed a car parked next to the dumpster. A man was standing next to the car and seemed to be drinking beer. Garcia saw one of the clerks run out of the market. This clerk turned around and ran back toward the market's entrance and then fell to the ground. Garcia's car radio had been on and she did not hear any gunshots. The man with the beer threw away the can, got into the passenger side of the car, and the car took off. Garcia pulled into the parking lot and tried to help Surjit and Mohinder.

Cynthia Mayo lived behind the market and was just pulling out of her garage when a car sped down the street. The car was completely dark and the headlights were not on, but she thought two or three people were inside.

Officers from the Tulare Police Department responded to the market and discovered Surjit's body in the parking lot, in front of the market's entrance. The officers searched the parking lot and found several beer cans, the box from an 18-pack of beer, and seven spent .22-caliber casings. The officers reviewed the market's security videotapes, which depicted the Hispanic male who entered the market and took the beer. The videotapes also picked up the sound of six or seven gunshots, and depicted Surjit running towards the market's entrance and collapsing in the parking lot.

The pathologist determined that Surjit, who was 23 years old, suffered three gunshot wounds: near the left armpit, in the lower abdomen, and in the left buttocks. The pathologist recovered three .22-caliber bullets from his body. The bullet which entered near his left armpit inflicted the fatal wound because it went through the left lung, the thoracic aorta, and the right lower lobe of the lung, and caused massive bleeding. The pathologist believed the gunman was probably stationary and Surjit was turning around as he was shot.

In March 2002, the investigators received a major break in the case when they were contacted by officers from Corcoran State Prison regarding information from an inmate, Arthur Fernandez, who was appellant's brother. Detective Robert French received a request from Arthur to speak with him, and met with Arthur. Thereafter, Detective French prepared several different photographic lineups which included appellant, Rudy Fernandez and Jorge Montanez. Mohinder reviewed these lineups, and identified Montanez as the person who entered the market and took the beer. Mohinder identified appellant as the person standing next to the car. Mohinder looked at two separate lineups before he selected appellant, and said he was 70 percent sure about appellant's identification.

In June 2002, Detective French conducted interviews with Rudy and Montanez. During these interviews, Rudy said he was driving the car, Montanez took the beer, and appellant fired the shots. In his separate interview, Montanez said he took the beer, Rudy was driving the car, and appellant fired the shots.

**Stipulations and Accomplice Testimony**

As set forth ante, an information was filed which charged appellant, Rudy, and Montanez with first degree murder of Surjit, with the special circumstances that the murder occurred while in the commission of a burglary and/or robbery. The court granted the parties' motion to sever their trials. Thereafter, Rudy and Montanez pleaded guilty to second degree robbery and agreed to testify for the prosecution.

Appellant was separately tried for first degree murder with special circumstances, and being an ex-felon in possession of a firearm. Appellant's trial was conducted in February 2004, and the jury heard the following stipulation about Montanez's plea:

'. . . George Montanez was charged alongside [appellant] with the first degree murder of Surjit Singh. It was further alleged that the murder of Surjit Singh was committed by the defendants while the defendants were engaged in the commission of the crime of robbery and/or burglary.'

'If George Montanez would have been either convicted by jury of this charge or pled guilty as charged, his maximum exposure under the law could have been 81 years to life in prison without the possibility of parole.'

'On January 14th, 2004, George Montanez pled guilty to an amended charge of second degree robbery under Penal Code Section 211.'

'In addition, George Montanez ... admitted having two prior felony convictions from 1999 which raised his maximum exposure to 31 years to life. At the time George Montanez entered his guilty plea to the amended charge, the court indicated a sentence of no more than eleven years in prison. George Montanez's sentencing date is currently set for February 11th, 2004.'

The jury also heard a stipulation about Rudy's plea:

'. . . Rudy Fernandez was charged alongside [appellant] with the first degree murder of Surjit Singh. [¶] It was further alleged that the murder of Surjit Singh was committed by the defendants while the defendants were engaged in the commission of the crime of robbery and/or burglary.'

'If Rudy Fernandez would have been either convicted by jury of this charge or pled guilty as charged, his maximum exposure under the law could have been 56 years to life in prison without the possibility of parole.'

'On January 12th, 2004, Rudy Fernandez pled guilty to an amended charge of second degree robbery under Penal Code Section 211. In addition, Rudy Fernandez admitted having a prior felony conviction from 1989, which raised his maximum exposure to 16 years.'

'At the time Rudy Fernandez entered his guilty plea to the amended charge, the court indicated the sentence of nine years in prison. Rudy Fernandez's sentencing date is currently set for March 24th, 2004.'

After the jury heard these stipulations, Montanez and Rudy testified as prosecution witnesses about the murder.

Montanez testified that as of November 2001, he was on parole after being convicted of two felonies. Montanez testified he spent the day and evening before the incident with appellant and Rudy. They drove around in Rudy's car, visited various friends, drank beer, and used methamphetamine. Late on the evening of November 23, 2001, they ended up at the home of Rene Valles and continued to drink beer and use methamphetamine. At one point, Valles produced a .22-caliber rifle with a sawed-off stock and gave it to appellant.

Montanez testified they eventually ran out of beer and did not have any more money. Appellant suggested they perform a "beer run," when someone enters a liquor market and takes beer without paying for it. Montanez and Rudy agreed with appellant's suggestion because they were "wasted" and wanted to continue drinking. They left Valles's house in Rudy's car, which was a two-door, brownish-gold 1984 Thunderbird. Montanez suggested they go to the Quick Stop market because he

thought the clerk knew Montanez's girlfriend, and Montanez felt he could take the beer without any trouble. Montanez testified they had all been drinking beer and tequila, and using methamphetamine that night. Montanez was "pretty intoxicated," and he thought appellant was also high.

Montanez testified that Rudy drove to the market and parked on the side of the building, and appellant asked who was going to do it. Montanez said he would take the beer, and appellant and Rudy agreed to wait in the car. Rudy was in the driver's seat and appellant was in the front passenger seat, and the car was still running. Appellant said that if anything happened, he was going to shoot. Montanez testified that appellant placed the .22-caliber rifle on the car's center console.

Montanez testified he went into the market and briefly chatted with Surjit about Montanez's girlfriend. Surjit seemed to relax, and Montanez went to the beer display and picked up two 18-packs of Budweiser. He placed the beer on the counter and acted as if he was going to pay, but instead picked up the beer and ran out of the market. As Montanez left the market, he heard someone behind him and realized Surjit followed him into the parking lot. Montanez ran around the side of the building and headed for Rudy's car, and saw appellant standing outside the car with the rifle. Montanez tripped, fell down, and dropped the beer. As Montanez fell, he saw appellant aim the rifle toward him and fire. Appellant told Montanez to get into the car. The beer cans scattered around the parking lot, and Montanez grabbed a few cans and jumped into the back seat through the passenger door. Appellant got into the front passenger seat and Rudy floored the car and left the parking lot.

Montanez testified he was shocked that appellant fired the gun, and Rudy asked appellant why he did it. They drove to another friend's house, and appellant gave the rifle to someone who lived there. They next drove to the house of appellant's girlfriend, and stayed there for the rest of the night.

Montanez was heavily impeached with his prior inconsistent statements to the police. Montanez admitted that when he initially spoke to the police about the incident, he was in prison on a parole violation, and falsely claimed that appellant forced him at gunpoint to perform the robbery and barricaded him behind a door at the friend's house later that night. Montanez subsequently gave another statement that he volunteered to perform the beer run. Montanez testified he did not receive any promises or deals in exchange for his statement, but knew he could be sentenced to life without parole. Just after he gave the second statement, he pleaded guilty to robbery with an indicated sentence of no more than 11 or 12 years, but insisted that he cooperated with the police "[i]n good faith for myself, for the victim, to show this court that what really happened and just tell the truth 'cause at one time, I was scared to tell the truth. I tried to protect myself with lies, but in the end, I just chose to let it out and whatever happened happened." Montanez testified that he had no idea that Surjit was going to be killed when they planned to go to the market.

Rudy also testified for the prosecution, and described how he spent the previous day and night with appellant and Montanez. They visited friends, drank beer and tequila, and used methamphetamine. At Rene Valles's house, appellant displayed a .22-caliber rifle with a sawed-off butt. Rudy asked appellant where he got the gun. Appellant said he found it in the alley.

Rudy testified Montanez brought up the topic of making a beer run to a liquor market to take some beer. Rene Valles was present as Rudy, appellant, and Montanez agreed to the beer run, but Valles did not join them because he did not want to bring any heat back to his house. Rudy drove his own car, with appellant in the front passenger seat

and Montanez in the back seat. Rudy testified that Montanez suggested the Quick Trip market because the clerk knew his girlfriend. As they drove to the market, Rudy asked Montanez "if something went wrong, would he trip, and [appellant] brought up the issue about he would handle it; don't worry, he would handle it."

When they arrived at the market, Rudy parked on the side of the building near the dumpster, and Montanez said he would go in and get the beer. Rudy's job was to wait in the car and make sure they got out of there, while Montanez's job was to go into the market and take the beer. Appellant got out of the front passenger seat so Montanez could get out of the back seat. As Montanez walked into the market, appellant used the dumpster to relieve himself. Appellant returned to the car and stood next to the open passenger door, and Rudy noticed appellant had a weapon. Rudy remained in the driver's seat and turned off the car's lights.

Rudy believed Montanez was in the market for about four minutes. Montanez suddenly ran around the corner toward the car, followed by the clerk. Appellant stepped away from the car, "the rapid shots were fired," and the clerk fell down. Montanez also fell down, dropped the beer, and one of the 18-packs broke open. Montanez tried to pick up the beer, and Rudy drove up to his position. Appellant and Montanez grabbed the loose beer cans and the 18-pack which was still intact, and they jumped into the car. Rudy quickly drove away from the parking lot.

Rudy testified that as he drove away, appellant seemed shocked but said that he thought "he got him," while Montanez laughed and seemed out of it. Appellant told Montanez to be quiet, and they drove to the house of another friend, Steven Vasquez. Appellant stored the rifle in Steven's garage, and Montanez used the bathroom to shave off his mustache because he realized he was on the market's security video cameras. They left Steven's house and spent the night at the home of appellant's girlfriend.

Rudy testified that when he initially spoke to the police, he admitted that he went to the market with appellant and Montanez and that appellant had the gun, but he "didn't give them the whole scenario of what happened from the beginning or nothing like that." Rudy lied about certain details, he did not disclose that they planned the beer run, and he said that he did not realize Montanez was going to do a beer run until he entered the market. Rudy subsequently gave another statement and told the same story, but then decided to cooperate and revealed the rest of the details. Rudy testified he was not given a deal in exchange for his cooperation, but his attorney encouraged him to give the details and his side of the story because "maybe it could happen, the deal."

Rudy testified he pleaded guilty to second degree robbery because he had a family and did not want to spend the rest of his life in prison. Rudy appeared as a prosecution witness because "this has been ... eating me for the last three years." Rudy was scared because he was still going to prison and "[p]eople are going to try to get me for what I'm doing right now." Rudy never expected the clerk to be killed when they planned the beer run. Rudy testified he never spoke to appellant's brother, Arthur, about the incident.

Rudy was also heavily impeached with his prior inconsistent statements about the murder, and whether he implicated appellant as the shooter simply because appellant threatened him. Rudy admitted that Johnny Vasquez, a mutual friend, mentioned that appellant and Montanez thought Rudy "would be the one to drop the dime," and that

appellant was going to kill him. Rudy insisted he was telling the truth because what appellant did was wrong, and there was no reason for him to take a person's life, "not for beer." Appellant also took Rudy and Montanez away from their families, and Rudy agreed to testify against appellant because appellant "made my life a living hell in the county jail. I mean, I'm like a victim ... I'm a marked person."

**Defense Evidence**

Rene Valles testified he could not remember seeing appellant, Rudy, or Montanez at his house, he never had a gun, and he did not know anything about their beer run. Valles admitted there were so many people who drank at his house, he had "no idea" if they were there, and he might have been drunk.

Johnny Vasquez testified he never talked to appellant about the robbery/homicide, and he never told Rudy that appellant confessed.

Sweet Ramirez, Steven Vasquez's girlfriend, testified appellant came by her house early in the evening to look for someone, but he never displayed a gun or tried to hide it there, and Montanez never showed up and shaved off his mustache.

Ramona Cordova, appellant's girlfriend, testified they watched movies together on the night of the murder. Montanez might have come by for a visit but he did not stay. Appellant spent the night with her and was there the next morning.

A clinical psychologist testified that he examined appellant and, based on appellant's description of various symptoms suffered throughout his life, believed that appellant suffered from the preexisting mental disorder of "significant anxiety disorder with panic attacks." Such a disorder would affect a person's ability to perceive the reality of actual situations, and results in paranoid thinking. Appellant also had an extensive history of methamphetamine use, he was intoxicated that evening based on his heavy drug and alcohol use, and such a condition would have led to inappropriate responses to stress. The psychologist's opinions were based on appellant's own statements about his medical history; he did not speak to any of appellant's family members or physicians, and did not review appellant's medical records. The psychologist did not believe that appellant was malingering because of the accuracy in which appellant described the physical symptoms of his prior panic attacks. Appellant's mother testified she suffered from mental stress and anxiety attacks.

(See Resp't Lodged 4 (footnotes omitted).)

## Discussion

**I.    Jurisdiction and Venue**

A person in custody pursuant to the judgment of a state court may file a petition for a writ of habeas corpus in the United States district courts if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375, n.7 (2000).  Venue for a habeas corpus petition challenging a conviction is proper in the judicial district in which the petitioner was convicted.  28 U.S.C. § 2241(d).

As Petitioner asserts that he is in custody pursuant to a State conviction which violated his

1   rights under the United States Constitution, the Court has jurisdiction over this action.  28 U.S.C. §

2   2254(a).   Petitioner was convicted in Tulare County, California, which is within the Eastern District

3   of California, and thus venue is proper in the Eastern District.  28 U.S.C. § 84; 28 U.S.C. § 2241(d).

4   **II.   <u>Standard of Review</u>**

5        On April 24, 1996, Congress enacted the Anti-terrorism and Effective Death Penalty Act of

6   1996 ("AEDPA"), which applies to all petitions for a writ of habeas corpus filed after the statute's

7   enactment.  <u>Lindh v. Murphy</u>, 521 U.S. 320, 326-27 (1997); <u>Jeffries v. Wood</u>, 114 F.3d 1484, 1499

8   (9th Cir. 1997).  The instant petition was filed after the enactment of AEDPA and is consequently

9   governed by its provisions.  <u>See Lockyer v. Andrade</u>, 538 U.S. 63, 70 (2003).  Thus, the petition

10  "may be granted only if [Petitioner] demonstrates that the state court decision denying relief was

11  'contrary to, or involved an unreasonable application of, clearly established Federal law, as

12  determined by the Supreme Court of the United States.'"  <u>Irons v. Carey</u>, 505 F.3d 846, 850 (9th Cir.

13  2007) (quoting 28 U.S.C. § 2254(d)(1))*,* <u>overruled in part on other grounds</u>, <u>Hayward v. Marshall</u>,

14  603 F.3d 546, 555 (9th Cir. 2010) (en banc); <u>see Lockyer</u>, 538 U.S. at 70-71.

15       Title 28 of the United States Code, section 2254 remains the exclusive vehicle for

16  Petitioner's habeas petition as Petitioner is in the custody of the California Department of

17  Corrections and Rehabilitation pursuant to a state court judgment.  <u>See Sass v. California Board of</u>

18  <u>Prison Terms</u>, 461 F.3d 1123, 1126-27 (9th Cir. 2006) <u>overruled in part on other grounds</u>, <u>Hayward</u>,

19  603 F.3d at 555.  As a threshold matter, this Court must "first decide what constitutes 'clearly

20  established Federal law, as determined by the Supreme Court of the United States.'"  <u>Lockyer</u>, 538

21  U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)).  In ascertaining what is "clearly established Federal

22  law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's]

23  decisions as of the time of the relevant state-court decision."  <u>Id.</u> (quoting <u>Williams</u>, 529 U.S. at

24  412).  "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal

25  principle or principles set forth by the Supreme Court at the time the state court renders its decision."

26  <u>Id.</u>  Finally, this Court must consider whether the state court's decision was "contrary to, or involved

27  an unreasonable application of, clearly established Federal law."  <u>Id.</u> at 72 (quoting 28 U.S.C. §

28  2254(d)(1)).  "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state

court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72. "Under the 'unreasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the State court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

Petitioner bears the burden of establishing that the state court's decision is contrary to or involved an unreasonable application of United States Supreme Court precedent.  Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable.  Clark v. Murphy, 331 F.3d 1062, 1072 (9th Cir. 2003) ("While only the Supreme Court's precedents are binding on the Arizona court, and only those precedents need be reasonably applied, we may look for guidance to circuit precedents"); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir. 1999) ("[B]ecause of the 1996 AEDPA amendments, it can no longer reverse a state court decision merely because that decision conflicts with Ninth Circuit precedent on a federal Constitutional issue. . . .  This does not mean that Ninth Circuit case law is never relevant to a habeas case after AEDPA. Our cases may be persuasive authority for purposes of determining whether a particular state court decision is an 'unreasonable application' of Supreme Court law, and also may help us determine what law is 'clearly established'").  Furthermore, the AEDPA requires that the Court give considerable deference to state court decisions.  The state court's factual findings are presumed correct.  28 U.S.C. § 2254(e)(1).  A federal habeas court is bound by a state's interpretation of its own laws.  Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir. 2002).

1        The initial step in applying AEDPA's standards is to "identify the state court decision that is

2  appropriate for our review."  Barker v. Fleming, 423 F.3d 1085, 1091 (9th Cir. 2005).  Where more

3  than one State court has adjudicated Petitioner's claims, a federal habeas court analyzes the last

4  reasoned decision.  Id. (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991) for the presumption

5  that later unexplained orders, upholding a judgment or rejecting the same claim, rests upon the same

6  ground as the prior order).  Thus, a federal habeas court looks through ambiguous or unexplained

7  state court decisions to the last reasoned decision to determine whether that decision was contrary to

8  or an unreasonable application of clearly established federal law.  Bailey v. Rae, 339 F.3d 1107,

9  1112-13 (9th Cir. 2003).  Petitioner raised some of his claims (Grounds Seven through Ten) through

10  a direct appeal and for these claims, the California Court of Appeal was the last state court to issue a

11  reasoned opinion; thus, the Court analyzes whether the appellate court's decision is an objectively

12  unreasonable application of federal law.  Petitioner concurrently raised the remainder of his claims

13  (Grounds One through Six), through a petition for writ of habeas corpus with the Tulare County

14  Superior Court, the California Court of Appeal and the California Supreme Court.  The California

15  Supreme Court and the California Court of Appeal issued summary denials of Petitioner's claims.

16  Therefore, the Court "look[s] through" those decisions to the last reasoned decision; in this case, that

17  of the Tulare County Superior Court.  See Nunnemaker, 501 U.S. at 804.

18  **III.**    **Review of Petitioner's Claims[3]**

19        The petition for writ of habeas corpus sets several grounds for relief, which all contend that

20  various rights were violated by the superior court.  Petitioner asserts the following arguments: (1)

21  that his waiver of his right to counsel was not both voluntary and intelligent; (2) the trial court's

22  denial of his motion for continuance of the preliminary hearing violated his Sixth Amendment rights

23  and rights to a fair trial; (3) given the pretrial publicity, the trial court abused its discretion in not

24  issuing gag orders or a change of venue; (4) the prosecutor's comments published in a local news

25

26

27

28

---

[3]The Tulare County Superior Court did not clearly state that it was denying any of Petitioner's claims on the basis of procedural bar.  Rather, the Superior Court reached the merits of Petioner's claims, (Grounds One through Six) and denied these claims.  Accordingly, the claim is not subject to procedural bar.  See Harris v. Reed, 489 U.S. 255, 263 (1989) (procedural default can only block a claim in federal court if the state court "clearly and expressly states that its judgment rests on a state procedural bar.").

account deprived him of a fair trial; (5) the trial court denied him reasonable accommodations in

violation of the Americans with Disabilities Act ("ADA"); (6) the trial court's imposed restitution

violated his liberty interest and due process rights; (7) he was afforded ineffective assistance of

counsel; (8) the trial court violated his due process rights by allowing Arthur Fernandez to testify; (9)

the trial court's use of jury instructions and verdict forms, along with the court's clarifying

instructions violated his right to a unanimous verdict; (10) the trial court erred in its imposition of the

consecutive term as authorized under the state's sentencing statutes, and; (11) the trial court erred in

determining his actual presentence custody.

### A.   Ground One:  Petitioner's Waiver of His Right To Counsel

In his first ground for relief, Petitioner alleges that his Sixth Amendment right to counsel was

violated because the trial court failed to ensure Petitioner's waiver of his right to counsel was both

voluntary and intelligent.  (See Petition at 12, 18.)  Petitioner claims he was "incapable of self-

representation" because he was suffering from a "anxiety panic disorder" resulting in his "inability to

focus."  (See Petition at 18.)  In light of his disorder, Petitioner argues the trial court's inquiry into

his mental competency was inadequate.  (See Petition at 18.)

Under the Sixth Amendment, a criminal defendant has the right to waive his right to counsel

and represent himself. Faretta v. California, 422 U.S. 806, 835 (1975). "[T]he first requirement in

this process is that the request to forego the assistance of counsel be unequivocal." U.S. v. Robinson,

913 F.2d 712, 714 (9th Cir. 1990). "The second requirement under this circuit's reading of Faretta is

that the defendant's waiver of the right to counsel must be made knowingly and intelligently; that is,

a criminal defendant must be aware of the nature of the charges against him, the possible penalties,

and the dangers and disadvantages of self representation." Id. (quotation marks omitted). "In addition

to being knowing and intelligent, a waiver of the right to counsel must also be voluntary." Id. at 715.

"Due process requires a court to conduct a competency hearing on its own motion, before

permitting a defendant to waive constitutional rights, whenever a reasonable judge would be

expected to have a bona fide doubt as to the defendant's competence."  Moran v. Godinez, 40 F.3d

1567, 1571 (9th Cir. 1994) (citations omitted).  "A bona fide doubt should exist when there is

substantial evidence of incompetence." Id.  "[S]uggestive evidence includes a defendant's demeanor

1  before the trial court, previous irrational behavior, and available medical evaluations." Id (citations

2  omitted).

3      "In reviewing whether a state trial judge should have sua sponte conducted a competency

4  hearing, we may consider only the evidence that was before the trial judge." Davis v. Woodford, 384

5  F.3d 628, 645 (9th Cir. 2004) (finding no substantial evidence to compel a competency hearing based

6  solely on the recalcitrant and detrimental behavior exhibited by defendant in Davis, as distinguished

7  from previous Supreme Court and Ninth Circuit precedents where there existed additional evidence,

8  such as history of psychiatric hospitalization, brain injuries, and diagnosis of severe delusion

9  disorder by court appointed psychiatrist). "[I]t is the defendant's burden in a collateral attack on an

10  uncounseled conviction to prove that he did not competently and intelligently waive his right to the

11  assistance of counsel. U.S. v. Lenihan, 488 F.3d 1175, 1177 (9th Cir. 2007) (citing Iowa v. Tovar,

12  541 U.S. 77, 92 (2004)).

13      Here, the record demonstrates a fully knowing and voluntary waiver of counsel and that at the

14  time of the waiver, there was no evidence or any indication that Petitioner was suffering from any

15  mental condition or disorder.  At the January 15, 2003, Preliminary Hearing Conference, Petitioner

16  notified the trial court that he wanted to represent himself.  (CT at 365, 374 Conference Transcript.)

17  The trial court specifically informed Petitioner, (and Petitioner acknowledged), that he was going to

18  "have all of the responsibilities of self-representation" and would be "facing an experienced

19  attorney."  Id.  After a recess, the court further advised Petitioner:

20      There's one case that I'll cite, People versus Lopez 71 CA 3rd, 568, a Court of Appeal
       case . . . which I will now proceed to – address some comments from this case and
21      then we'll talk about some more things here with you. . . . [quoting from Lopez the
       court continued] "The trial judge must recognize that the first ground on appeal is
22      probably going to be that the defendant was allowed to represent himself without
       having intelligently and voluntarily made that decision.  Such are the facts of life.
23      Therefore, pragmatically and defensively in addition to the legal necessity of
       establishing that a defendant voluntarily and intelligently reaches this decision, the
24      trial court should also protect itself and the record.". . . .  (CT at 375 Conference
       Transcript.)
25
       Further advising Petitioner of the dangers and disadvantages of self representation, the court
26
   continued:
27
       Secondly, we feel it would certainly be advisable to make some inquiry into his
28      intellectual capacity to make this so called intelligent decision.  In this category

inquiry might be made of:

A.  His education and familiarity with legal procedures, for example, can he read and write.  If not, how does he propose to handle such items as written exhibits and instructions.

B.  If there is any question in the court's mind as to a defendant's mental capacity, it would appear obvious that a rather careful inquiry into that subject should be made, probably by way of a psychiatric examination.  It would be trifle embarrassing to get halfway through a trial only to discover that a court has determined that a mentally deficient or seriously mentally ill person has been allowed to make a knowing and intelligent decision to represent himself.

C.  In order to show that his choice is an intelligent one, he must be aware of the alternative , the right to counsel.  He should be made aware of just what that means, including of course, his right to court appointed counsel at no cost to himself.

D.  Perhaps some exploration into the nature of the proceedings, the possible outcome, possible defenses and possible punishments might be in order.  While this may seem to be sliding back into pre-Farretta practices, it will serve to point up to defendant just what he is getting himself into and establish beyond question that he knows what he is doing and his choice is made with eyes open.

E.  It should be made clear that if there is misbehavior or trial disruption, the defendant's right of self-representation will be vacated. . . . .

. . . . Now I think we covered most of this anyway before the break, and again, just to summarize things here, you do understand, again, that the judge can't give you any help or legal advice.  That, you know, you're gonna - - you'll be given some ability to conduct your own defense, but we can't - - we don't have the ability to let you spend all day and evening in the law library or things of that nature.  Do you understand that?

DEFENDANT DANIEL FERNANDEZ:      Yes.  (CT at 375 Conference Transcript.)

After additional discussion with Petitioner the trial court continued:

So it doesn't make any sense to me, but I - - I will admit - - that I - - and I have already told you this a couple of times, that our highest court said that people could represent themselves if they're competent and mentally capable of doing it basically, and you've already stated that you can read and write.  You answered the court's questions to some extent.  You made some statements in here that seems to tell me that you seem to understand what's going on.  You're not crazy either. . . . (CT at 375 Conference Transcript)

The trial court also asked if anyone had threatened Petitioner in order to get him to waive his right to counsel and Petitioner responded no.  (CT at 375)  Next, the following exchange occurred:

THE COURT: . . . . So all right. Do you want to do it or not?

DEFENDANT DANIEL FERNANDEZ: Yes.  I want to go pro per.

THE COURT: Well, anybody have anything else on this?  I think we're at an end here.  Okay.  The public defender is released and the gentleman is - - I find that he's

intelligently made a decision to represent himself pro per. When I said, "intelligently," I mean, in the sense of being made aware of the dangers and disadvantages and all the problems that could result, evidentiary, legally, all those issues I have gone over with him. He appears to have a knowledge of reading and writing. While he hasn't got a college degree, that's not required. He doesn't appear to me mentally incompetent. Nobody has presented any evidence that he has a psychiatric history or issues of that kind. Are you on any medication today?

DEFENDANT DANIEL FERNANDEZ: No.

THE COURT: Okay. Fine. He's not on any medication, and you understood everything that happened here today?

DEFENDANT DANIEL FERNANDEZ: Yes. (CT at 375.)

Following this exchange, the trial court allowed Petitioner to represent himself and on March 20, 2003, Petitioner was held to answer to the charges in the complaint. (CT at 387-388.) On May 1, 2003, Petitioner filed his petition to proceed in propria persona. (CT at 316.) Petitioner completed a five page document, provided to him by the court, which again advised Petitioner of his legal rights, the disadvantages of self-representation, and Petitioner acknowledged (by initialing the form) the charges and potential consequences he was facing, and that he had been advised not to represent himself. (CT at 316-320.) Similar to the court's earlier colloquy, the court examined Petitioner. (RT at 4-13.) After advising Petitioner's of his legal rights, the dangers of self representation, and advising Petitioner against waiver of his right to counsel, the court stated:

THE COURT: All right. Mr. Fernandez, do you have any questions at all of me? Is there any issue that you wish to explore?

DEFENDANT FERNANDEZ: Any issues?

THE COURT: Insofar as your decision to either have an attorney or to represent yourself.

DEFENDANT FERNANDEZ: I still wish to continue to represent myself, your Honor.

THE COURT: Okay, all right. All right. I hear what you just said, I really did, but I'm going to ask it in another way; all right?

You are telling me that – from what you just said, what I am understanding you to say is that you understand your right to have an attorney, an appointed if you don't have the money; that you're giving up your right to have an attorney, and you're asking me to represent yourself?

DEFENDANT FERNANDEZ: Yes, your Honor.

THE COURT: All right. All right.

Well, based upon my discussion with Mr. Fernandez, I met him this week.  We've had a little bit of discussion in the past.  I'm satisfied that by the standard that is applicable to Faretta proceedings, that Mr. Fernandez is competent by that standard, by the Faretta standard to represent himself; that he understands his present situation; that we've been able to intelligently discuss the - - the ramificaitons of self-representation.  Most importantly, he's been able to engage in that discussion in an intelligent way; that Mr. Fernandez understands the consequences of the request for self-representation, as well.

I find that Mr. Fernandez has voluntarily and intelligently waived his right to have an attorney represent him; that he has been fully advised prior to that of his right to counsel; that he has been advised not to give up his right to counsel and that he understands the consequences of giving up his right to counsel.  So I find that this is a knowledgeable, informed, voluntary - - well, let me make sure about that.  Nobody's putting any pressure on you to do this?

DEFENDANT FERNANDEZ: No, your Honor.

THE COURT: This is something you're doing of your own free will?

DEFENDANT FERNANDEZ: Yes.  I just wish to exercise my Constitutional rights.

THE COURT: All right.  It is your consitutional right.

DEFENDANT FERNANDEZ: Yes.

THE COURT: All right.  That he is voluntarily giving up his right to counsel and fully understands the consequences.  All right.  So your motion to represent yourself is granted.[4]  (RT 11-13.)

In sum, the record demonstrates Petitioner was competent to waive counsel, and that the trial court, on two separate occasions, carefully ensured Petitioner's decision to do so was knowing, intelligent, and voluntary.

In its reasoned decision denying Petitioner's writ, the Tulare County Superior Court noted Petitioner's claim stating:

The petitioner alleges that the court abused its discretion by failing to thoroughly investigate whether he was competent to act as his own attorney.  The petitioner claims that he was suffering from severe anxiety panic disorder and inability to focus.  The petitioner was thoroughly examined by the trial judge . . . . He cannot now claim ineffective assistance of counsel.  (See Resp't Lodged 10.)

The court must presume that state court's factual findings are correct. 28 U.S.C. § 2254(e)(1).

The court may not overturn state factual findings "absent clear and convincing evidence" that they

---

[4]On May 8, 2003, Petitioner informed the trial court that he no longer wanted to continue in pro per and on May 9, 2003, the court appointed counsel to represent Petitioner.  (CT at 331-332.)  Petitioner was represented throughout the remainder of the Superior Court proceedings.

are "objectively unreasonable." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003); Stenson v. Lambert, 504 F.3d 873, 881 (9th Cir. 2007). The Ninth Circuit has stated that in applying the Faretta factors, federal courts must give significant deference to the trial court's factual findings. See Stenson, 504 F.3d at 882 (citing 28 U.S.C. § 2254(e)(1) which states that state court factual findings "shall be presumed to be correct").  Here, Petitioner has failed to present any evidence to overcome the presumption of correctness that this court must accord the trial court's factual determination regarding Plaintiff's mental competency at the time of his waiver.  See 28 U.S.C. § 2254(e)(1). Consequently, habeas relief is not available on this claim.

**B.      Ground Two: The Trial Court's Denial of Petitioner's Motion for Continuance**

In his second ground for relief, Petitioner argues that the trial court's decision to deny his motion for continuance of the preliminary hearing resulted in a violation of his Sixth Amendment rights to confrontation and violated his rights to due process.  More specifically, he contends that without the continuance he was unable to adequately prepare and thus denied any opportunity for effective cross-examination.  Petitioner argues this error was further compounded by the trial court's failure to provide him with prescription eye glasses.  Petitioner also contends in denying his motion, the court abused its discretion and denied his right to present a defense.[5]  (See Petition at 25-26.)

Petitioner presented these claims in a petition for writ of habeas corpus to the Tulare County Superior Court, which denied the petition in a reasoned opinion on February 9, 2007.  (See Lodged Doc. 10.)  The issue was then raised in a petition for writ of habeas corpus to the California Court of Appeals and California Supreme Court which both summarily denied the petition.  (See Lodged Docs. 12 & 14.)  The Court of Appeals and the California Supreme Court, by their "silent orders" denying the petition, are presumed to have denied the claims presented for the same reasons stated in the opinion of the lower court. Nunnemaker, 501 U.S. at  803.

---

[5] Additionally, though not fully developed in argument, Petitioner appears to argue that denial of his motion for a continuance also led to his ineffective self-representation and violation of his Sixth Amendment right to counsel.  However as the Ninth Circuit has stated:  "[A] defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel,'" Savage v. Estelle 924 F.2d 1459, 1466 (9th Cir. 1990) (citing Faretta, 422 U.S. at 834 n.46.)  Further, Petitioner was clearly advised of the dangers of self-representation as he initialed the trial court's provided form, "Petition to Proceed In Propria Persona" where it stated: "I understand that if I am convicted I will not be able to complain on any appeal that I did not effectively represent myself.  (CT at 318.)

1    "The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf

2    have long been recognized as essential to due process."  Chambers v. Mississippi, 410 U.S. 284, 302

3    (1973) ("Few rights are more fundamental than that of an accused to present witnesses in his own

4    defense").  The Sixth Amendment's Confrontation Clause is applicable to the states through the Due

5    Process Clause of the Fourteenth Amendment.  Hernandez v. Small, 282 F.3d 1132, 1137 n.3 (9th

6    Cir. 2002) (citation omitted).  The Confrontation Clause of the Sixth Amendment guarantees a

7    criminal defendant the right to be confronted with the witnesses against him.[6]  E.g., Slovik v. Yates,

8    545 F.3d 1181, 1185-86 (9th Cir. 2009) (citation omitted).  "The Supreme Court has explained that

9    the right of confrontation 'means more than being allowed to confront the witness physically,' but

10   rather '[t]he main and essential purpose of confrontation is to secure for the opponent the opportunity

11   of cross-examination.'"  Id.  "The right to confrontation is a trial right, designed to prevent improper

12   restrictions on the types of questions that defense counsel may ask during cross-examination."

13   Pennsylvania v. Ritchie, 480 U.S. 39, 53-54 (1987).  The right to confront witnesses is not absolute,

14   however, and in exercising this right, the accused must comply with the state's established rules of

15   procedure and evidence.  See, e.g., Chambers, 410 U.S. at 308.

16   Confrontation Clause errors are subject to harmless-error analysis.  Slovik, 556 F.3d at 755.

17   "In reviewing state court decisions for harmless error in the context of a habeas petition, federal

18   courts review to determine if the error had 'a substantial and injurious effect or influence in

19   determining the jury's verdict.'"  Id. (quoting Brecht v. Abrahamson, 507 U.S. 619, 623 (1993)).  "In

20   making this inquiry, the court must review the record to determine 'what effect the error had or

21   reasonably may be taken to have had upon the jury's decision.'" Id. (citations omitted).

22   In rejecting Petitioner's claim, the Tulare County Superior Court found no abuse of discretion

23   in the court's denial of the continuance.  (See Resp't Lodged Doc. 10.)  We agree with the Superior

24   Court's finding that the time between Petitioner's waiver of counsel in January of 2003, and his

25

26   [6]As a threshold matter, although there is no Ninth Circuit decision directly on point, Petitioner's claim that he has a
     constitutional right to confront witnesses at a preliminary hearing has been rejected by other circuits.  See United States v.
27   Harris 458 F.2d 670, 678 (5th Cir. 1972) ("There is no Sixth Amendment requirement that a defendant also be allowed to
     confront a witness at a preliminary hearing prior to trial."); United States v. Andrus 775 F.2d 825, 836 (7th Cir. 1985); see
28   also Peterson v. California 604 F.3d 1166 (9th Cir. 2010), (discussing both Harris, Andrus, as well as Supreme Court cases
     holding that the confrontation Clause is primarily a trial right).

preliminary hearing in March, 2003 was more than adequate.  (See Resp't Lodged Doc. 10.)
Regarding Petitioner's claim that the lack of prescription glasses hindered his preparation, the trial
court noted Petitioner had never stated that he could not read without his glasses.   Additionally, the
court considered that, Petitioner, at hearing, had read his statement to the court which demonstrated
his ability to read without glasses. (CT at 118.)  In light of these facts, the Court finds the trial court
properly denied Petitioner's motion to continue.

Assuming arguendo, Petitioner's Confrontation Clause rights were violated, the Court finds
the violation was harmless error. See Delaware v. Van Arsdall, 475 U.S. 673, 680 (1986)
(Confrontation Clause violations subject to harmless error analysis). To obtain habeas corpus relief,
Petitioner must demonstrate that the error "'had substantial and injurious effect or influence in
determining the jury's verdict.'" Brecht, 507 U.S. at 637-38 (quoting Kotteakos v. United States, 328
U.S. 750, 776 (1946)).  Here, as the Superior Court petition noted, Petitioner has failed to explain
how any proposed cross-examination at the preliminary hearing would have effected his defense or
otherwise had a substantial effect or influence on the outcome of the trial.  See United States v.
Berry, 814 F.2d 1406, 1409 (9th Cir. 1987) (stating petitioner must show what testimony would have
been elicited and how it would have changed the outcome).  Habeas relief is available only if the
record demonstrates the jury's decision was substantially influenced by an error or there is "grave
doubt" about whether an error was harmless.  O'Neal v. McAninch, 513 U.S. 432, 434 (1995).  The
record establishes neither in this case.  Petitioner has not demonstrated that his opportunity to cross
examine witnesses at the Preliminary Hearing, even assuming it was diminished, had any effect on
the jury's verdict, let alone a  substantial and injurious one.  Consequently, the Court finds that
Petitioner is not entitled to habeas corpus relief on this ground.

**C.      Ground Three and Four:  Petitioner's Claim That Prosecutorial Misconduct Caused Intense Pretrial Publicity Depriving Him Of A Fair Trial**

In his next two grounds for relief, Petitioner contends that the Prosecutor's statements made
to the media during the pendency of the trial constituted misconduct and deprived Petitioner of a fair
trial.  Petitioner similarly contends that given the intense pretrial publicity, he was deprived of a fair
trial.

Petitioner's claim regarding the Prosecutor's statements and pretrial publicity were presented in his petition to the Tulare County Superior Court, which provided the last reasoned decision to adjudicate these claims.  (See Lodged Doc. 10.)  In denying Petitioner's claims, the Superior Court stated:

> The petitioner claims that the intensity of the pretrial impaired his ability to get a fair trial and an impartial jury.  The fact is, however, that the court was able to get a fair and impartial jury and the petitioner has stated nothing in his writ that supports his contention that he did not get a fair trial.  (See Resp't Lodged 10.)

The standard of review for prosecutorial misconduct is "the narrow one of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986). According to the Supreme Court, "the touchstone of a due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." Smith v. Phillips, 455 U.S. 209, 219 (1982).  A federal court sitting in habeas corpus must distinguish between "ordinary error of a prosecutor and that sort of egregious misconduct" that "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643, 47-48 (1974).

Regarding Petitioner's claims of pretrial publicity, the Sixth Amendment guarantees every defendant the right to a fair trial by an impartial jury. "If pretrial publicity is such that it is impossible to seat such a jury, a judge must grant a defendant's request for a change of venue." Randolph v. California, 380 F.3d 1133, 1142 (9th Cir. 2004).  The requirement of an impartial jury, however, does not require "a jury completely ignorant of the facts." United States v. Sherwood, 98 F.3d 402, 410 (9th Cir. 1996).  In order to establish a constitutional violation on the basis of pretrial publicity, the defendant must establish either actual or presumed prejudice. Randolph, 380 F.3d at 1142. Actual prejudice is established when the defendant demonstrates that "jurors exhibited actual partiality or hostility that could not be laid aside." Id. "Prejudice is presumed only in extreme instances 'when the record demonstrates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime.'" Daniels v. Woodford, 428 F.3d 1181, 1211 (9th Cir. 2005) (quoting Ainsworth v. Calderon, 138 F.3d 787, 795 (9th Cir. 1998), as amended, 152 F.3d 1223).  As stated by the Ninth Circuit:

> Three factors should be considered in determining presumed prejudice: (1) whether there was a "barrage of inflammatory publicity immediately prior to trial, amounting

to a huge ... wave of public passion"; (2) whether the news accounts were primarily factual because such accounts tend to be less inflammatory than editorials or cartoons; and (3) whether the media accounts contained inflammatory or prejudicial material not admissible at trial. Id. (citations omitted); Harris v. Pulley, 885 F.2d 1354, 1361 (9th Cir. 1988) (finding the presumption of prejudice is "rarely applicable and is reserved for an 'extreme situation.'" (internal citations omitted)).

Here Petitioner contends the trial court should have sua sponte issued a change of venue or gag order due to the prosecutor's comments and the resulting pretrial publicity.  However, petitioner does not describe the publicity that allegedly implicates his right to a fair trial and instead states "counsel for the people and representatives from the Tulare Police Department continuously commented on the case invoking prejudicial publicity." (See Petition at 27.)  While Petitioner does not assert "actual" prejudice, he does contend the inappropriate publicity resulted in "a presumption of inherent prejudice."  (See Petition at 30.)

The only evidence in the record of any Prosecutor's comments or pretrial publicity was an online article published by the Tulare Advance Register on March 21, 2003.  (CT at 329-30.)  The article read:

> A Tulare County Superior Court Judge ordered three men to stand trial in connection with the November 2001 fatal shooting of Amarjit Multan.
>
> Judge Walter Gorelick told Daniel Fernandez, Rudy Fernandez and Jorge Montanez, all of Tulare, that they would face charges of first-degree murder after a preliminanry hearing Thursday.
>
> The two Fernandezes, who are cousins, and Montanez are scheduled for an arraignment April 4 at the Visalia courthouse.
>
> Multan, a native of India, was shot and killed while he ran after a man who had stolen two 18-packs of Budweiser beer from the Kwik Serve Gas station 1370 East Bardsley Ave.  Multan had moved to Tulare from New York to help run the store after a family member underwent heart surgery.
>
> Court documents identified Daniel Fernandez, 25, as the suspected shooter and Montanez, 22, as the man who took the beer cases.  Rudy Fernandez, according to the documents, was waiting in a car parked nearby.
>
> If convicted, the defendants could face the death penalty because the slaying was committed during a robbery.
>
> Prosecutor John Jackson said a committee in the next few weeks will review the possibility of seeking the death penalty against the defendants.
>
> "Usually, the committee meets two or three weeks after the preliminary hearing." Jackson said.

1    Police found shell casings at the scene, but no weapon has been recovered.

2    Having three defendants makes the case go slower.

3    "There are three attorneys asking questions." Jackson said.  "Some legal issues are
     more complex, but it doesn't get to the level where it's too hard."

4    The defendants remain in custody without bail.  (CT at 329-30.)

5    The Court finds that the Superior Court's determination that Petitioner's claims of intense

6    pretrial publicity were unsupported by the record was not objectively unreasonable.  The Prosecutor's

7    pretrial statements in the single online article were accurate, brief, and factually related to the legal

8    process and offense and thus did not deprive petitioner of his due process right to a fair trial.[7]

9    Further, prior to the presentation of evidence, the jury was directed to avoid media coverage of the

10   trial and if inadvertently exposed, to notify the court.  (RT at 320-321.)  Additionally, prior to

11   adjourning for deliberations, the trial court properly admonished the jury to find the facts for

12   themselves based only on the evidence received at trial and not to be influenced by "sentiment, . . .

13   passion, prejudice, public opinion or public feeling."  (RT at 1051.)  It is presumed that the jury

14   followed these instructions, as nothing in the record suggests otherwise. See Richards v. Marsh, 481

15   U.S. 200, 206, (1987) (there is an "almost invariable assumption of the law that jurors follow their

16   instructions").

17   Petitioner supports his claim of prejudice with citations to Shepard v. Maxwell, 384 U.S. 333

18   (1966), and Rideau v. Louisiana, 373 U.S. 723 (1963), two United States Supreme Court cases

19   examining intense pretrial publicity where motions for change of venue were denied.  These cases do

20   not support petitioner's claim for the following reasons.

21   First, petitioner did not have a motion for change of venue based on prejudicial pretrial

22   publicity denied by the trial court as did the defendants in those cases.  Shepard, 384 U.S. at 348;

23   Rideau, 373 U.S. at 724.  Second, petitioner's allegations do not come close to demonstrating the

24   intensity of pretrial publicity or the prejudicial effect that occurred in Shepard and Rideau.  See

25   Shepard, 384 U.S. at 344-45 (describing "intense" pretrial publicity including multiple newspaper

26

27   _____

28   [7] Petitioner's suggestion of a "media frenzy" or "extensive" media coverage of the case up to and during the trial is not
     supported by the record.  Further, there is nothing in the record reflecting that the prosecutor had any involvement in any
     media coverage other than the March 23, 2003, Tulare Advance Register article.  (See Petition at 27.)

articles and television broadcasts that continued unabated for the nine week trial during which

"jurors were constantly exposed to news media" and "their massive coverage of the trial"); Rideau,

373 U.S at 724-26 (reversing conviction where the petitioner's videotaped confession had been

broadcast multiple times in the community prior to trial). Finally, review of the record does not

reveal, nor has Petitioner attempted to demonstrate, that any jurors were aware of the prosecutor's

statements or, if they were, that they were unable to lay aside their prior impressions and render a

verdict based solely on the evidence presented in court.

The prosecutor's statements in the article published before trial were not the "sort of

egregious misconduct . . . amount[ing] to a denial of constitutional due process." Donnelly, 416 U.S.

at 647-48.  Petitioner received a fair trial following the accurate statements by the Prosecution

published online prior to commencement of his trial.

**D.      Ground Five: Petitioner's Claims Under The Americans With Disabilities Act**

Petitioner claims that the trial court denied him reasonable accommodations in violation of

the Americans with Disabilities Act ("ADA") by not accommodating either his need for eyeglasses

or his severe anxiety panic attack disorder.  Petitioner further contends that this violation deprived

him of due process of law and the right to a fair trial, as well as the effective assistance of counsel.[8]

The right of an accused in a criminal trial to due process is, in essence, the right to a fair

opportunity to defend against the State's accusations.  Chambers, 410 U.S. at 294.  Title II of the

Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq., provides that "no qualified

individual with a disability shall, by reason of such disability, be excluded from participation in or be

denied the benefits of the services, programs, or activities of a public entity, or be subjected to

discrimination by any such entity," including access to the courts. 42 U.S.C. § 12132; Tennessee v.

Lane, 541 U.S. 509, 532 (2004) (quoting Boddie v. Connecticut, 401 U.S. 371, 379 (1971) for the

proposition that: "[t]his duty to accommodate is perfectly consistent with the well-established due

process principle that, 'within the limits of practicability, a State must afford to all individuals a

---

[8]Petitioner's novel claim that the court's failure to reasonably accommodate his claimed disabilities resulted in the ineffective assistance of counsel is unclear and unexplained.. (See Petition at 35.)  However, as discussed in Footnote 4 above, during the period of his self-representation, Petitioner waived his claims to ineffective assistance of counsel.  Any of Petitioner's remaining claims of ineffective assistance of counsel, are addressed by the Court, at Grounds Seven, below.

1  meaningful opportunity to be heard' in its courts").

2      Petitioner's claim is without merit. First, assuming arguendo, both that Petitioner can bring an

3  ADA claim here[9] and that Petitioner had a disability or disabilities, he has not shown that the trial

4  court, once made aware of his claimed disabilities, failed to provide a reasonable accommodation.

5      Regarding Petitioner's request for glasses, the record is unclear as to when Petitioner first

6  made this request.  However, at the March 19, 2003, hearing on Petitioner's Motion for Continuance,

7  Petitioner's asked that he be provided glasses "to read the discovery" and the Court stated that it had

8  already requested this be addressed.[10]  (CT at 104, 118.)  Later, in his moving papers of March 27,

9  2003, Petitioner declared he was far-sighted and needed glasses to read.  In response, on April 4,

10  2003, the court signed an order permitting Petitioner to see an optometrist at his own expense.  (CT

11  at 271, 274.)  Given these facts, the Court cannot say that Petitioner established that he was denied

12  reasonable accommodation regarding his need for prescription glasses.

13      Regarding Petitioner's claim that he suffered from anxiety disorder, on January 15, 2003, the

14  court granted Petitioner's request to waive counsel stating that there was "no evidence of any

15  psychiatric history or issues of that kind."  (CT at 387.)  Further, as noted above, the record

16  demonstrates that Petitioner's waiver of counsel was knowing, intelligent, and voluntary.

17      On November 14, 2003, Petitioner's counsel requested the court direct a medical examination

18  for Petitioner's "recurring" anxiety disorder, which it appears from the record, was the first notice

19  provided to the trial court of Petitioner's potential mental illness.  (RT at 114-116.)  Petitioner's

20  Counsel contended that the Tulare County Sheriff had denied Petitioner of any type of medication or

21  appropriate examination.  (RT at 114-115.)  Though the trial court denied Petitioner's request, it

22  noted the sheriff's independent obligation to provide care and further stated that specific procedures

23  were available to address these concerns.  (RT at 115.)  Defense Counsel then advised the court that

24  _____

25  [9]Though not directly on point, the Ninth Circuit has stated that claims brought pursuant to the ADA are cognizable in habeas
   corpus actions in the context of addressing state prisoners ADA claims related to the State Parole Board's consideration of
26  substance abuse as a factor in setting parole release dates.  Bogvich v. Sandoval, 189 F.3d 999, 1003,1004 (9th Cir. 1999).

27  [10]The record reflects a one page document dated March 5, 2003, entitled "Requested Orders Of The Court," stating "1.
28  Prescription and Glasses." which appears to have been prepared by Petitioner.  (CT at 65.)  There is nothing in the record,
   nor does Petitioner contend, that he requested he be provided with glasses at any time prior.

1  if needed she would raise the issue later, and the trial court agreed to address any issue as

2  appropriate.  (RT at 115-116.)  Because the Court finds nothing in the record indicating any other

3  reference to the adequacy of Petitioner's care, the Court cannot say that the trial court failed to

4  reasonably accommodate Petitioner's mental health concerns.

5      Finally, the record indicates that Petitioner possessed: (1)  a rational as well as factual

6  understanding of the proceedings against him, and; (2)  sufficient present ability to file multiple

7  motions during the period of his self-representation and consult with his lawyer with a reasonable

8  degree of rational understanding once counsel was reappointed.  Accordingly, Petitioner's claim fails.

9      **E.      Ground Six: Petitioner's Claim That The Trial Court's Imposition Of**
         **Restitution Violates His Liberty Interest and Due Process**

10

11  Petitioner claims that the restitution fine of $10,000 violates California Penal Code section

12  1202.4 subdivisons (c) and (d) as well as his liberty interests and rights afforded under due process.

13      A federal habeas court can only entertain a petition on the ground that the petitioner "is in

14  custody in violation of the Constitution or laws or treatise of the United States." 28 U.S.C. § 2254(a).

15  The Ninth Circuit has interpreted "in custody" to exclude challenges to purely monetary

16  punishments. See Bailey v. Hill, 599 F.3d 976, 978 (9th Cir. 2010) (court found that a state prisoner's

17  challenge to his restitution order was not cognizable under federal habeas review even though he was

18  in custody when he brought the petition).  Each claim advanced in a habeas petition must be

19  reviewed independently to ascertain whether Petitioner is challenging his custody. See U.S. v.

20  Thiele, 314 F.3d 399, 402 (9th Cir. 2002). To determine whether each claim is cognizable under

21  federal habeas review, the court must "focus on the relief sought in the claim itself, not on relief

22  sought in other claims mentioned elsewhere in the motion." Id. (citing U.S. v. Kramer, 195 F.3d

23  1129, 1130 (9th Cir. 1999).

24      In this case, Petitioner states several grounds for relief, one of which challenges the $10000

25  restitution fine he was assessed.  (See Petition at 36.)  Because Petitioner's challenge to the

26  restitution fine does not claim that he is in custody in violation of federal law, it is not cognizable on

27  federal habeas review. Thus, Petitioner cannot receive relief on this ground.

28

1

2    **F.      Ground Seven: Petitioner's Claims Regarding Ineffective Assistance of Counsel**

3          Petitioner claims that his trial counsel was constitutionally ineffective because his counsel

4    failed to: (1) investigate a potential witness;  (2) obtain telephone records; (3) investigate individual

5    jurors' subscriptions to news sources; (4) compel the attendance of David Singh, who assisted

6    investigators in translating a witness' interview, and; (5)  seek a writ of mandate following denial of

     his section 1118.1 motion.

7
          An allegation of ineffective assistance of counsel requires that a petitioner establish two
8
     elements:  (1) counsel's performance was deficient and (2) petitioner was prejudiced by the
9
     deficiency. Strickland v. Washington, 466 U.S. 668, 687 (1984); Lowry v. Lewis, 21 F.3d 344, 346
10
     (9th Cir. 1994). Under the first element, the petitioner must establish that counsel's representation
11
     fell below an objective standard of reasonableness, specifically identifying alleged acts or omissions
12
     which did not fall within reasonable professional judgment considering the circumstances.
13
     Strickland, 466 U.S. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995).
14
     Judicial scrutiny of counsel's performance is highly deferential and there exists a "strong
15
     presumption that counsel's conduct [falls] within a wide range of reasonable professional assistance;
16
     that is, the defendant must overcome the presumption that, under the circumstances, the challenged
17
     action 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 687 (quoting Michel v.
18
     Louisiana, 350 U.S. 91, 101 (1955)); Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994).
19
          Second, the petitioner must show that counsel's errors were so egregious that the petitioner
20
     was deprived of the right to a fair trial, namely a trial whose result is reliable. Strickland, 466 U.S. at
21
     687. To prevail on the second element, the petitioner bears the burden of establishing that there
22
     exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the
23
     proceeding would have been different. A reasonable probability is a probability sufficient to
24
     undermine confidence in the outcome." Quintero-Barraza, 78 F.3d at 1348 (quoting Strickland, 466
25
     U.S. at 694). A court need not determine whether counsel's performance was deficient before
26
     examining the prejudice suffered by the petitioner as a result of the alleged deficiencies. Strickland,
27
     466 U.S. at 697. Since prejudice is a prerequisite to a successful claim of ineffective assistance of
28

counsel, any deficiency that was not sufficiently prejudicial to the petitioner's case is fatal to an ineffective assistance of counsel claim.  Id.

In the last reasoned decision denying Petitioner writ, the Tulare County Superior Court stated: "[g]iven the weight of the evidence against the petitioner the petitioner has failed to meet the standard to show ineffective assistance of counsel."  (See Resp't Lodged 10.)

1.      Petitioner's Counsel's failure to investigate a potential defense witness

Petitioner argues his counsel failed to investigate a potential witness for the defense, Michael Johnson, who Petitioner contends would have provided "essential" evidence regarding the character of Rudy Fernandez.  (See Petition at 40.)  Johnson was an inmate with a total of ten felony convictions for crimes of moral turpitude, three felony convictions for serious felonies, robbery, sexual penetration by force, and assault and was pending charges for two counts of forcible oral copulation and one count of rape by force and was facing a potential sentence of 485 years to life. (CT 762.)  Following Petitioner's conviction, on July 9, 2004, Johnson provided a signed declaration to Petitioner's counsel.  At Petitioner's motion for a new trial, trial counsel introduced the declaration to attack the credibility of testimony provided by Petitioner's accomplice, Rudy Fernandez.  (CT 769.)  In his declaration, Johnson stated that Rudy Fernandez had "hinted" he had lied at Petitioner's trial, that he had witnessed Rudy Fernandez attempt to convince Arturo Fernandez to testify against Petitioner, and that Rudy Fernandez had lied to him.  (CT 769.)

Petitioner's claim lacks merit.  In an effort to impeach the character of Rudy Fernandez at trial, Petitioner's counsel introduced Rudy's prior false statement to the police (RT 729-730, 733, 791-792), his drug use on the night of the homicide (RT 740-741), and Rudy's attempt to obtain a better "deal" in exchange for his testimony.  (RT 719-721, 833-834.)  In light of his counsel's effort to discredit the witness and considering the likely effect of Mr. Johnson's criminal record on his own credibility, Petitioner has not shown a reasonable probability that Mr. Johnson's additional testimony would have had any effect on the outcome of the trial.  Accordingly, Petitioner's claim must fail.

2.      Failing to obtain telephone records

Petitioner claims that his counsel's performance was ineffective because she failed to obtain telephone records from the California Department of Corrections and Rehabilitation that would have

refuted Arturo Fernandez's "assertions" that Arturo and Petitioner had telephone conversations prior to petitioner's arrest.  (See Petition at 41.)  Petitioner's claim lacks merit because Arturo Fernandez never provided any testimony regarding any telephone conversations made between himself and Petitioner.  (RT 839-841.)  In fact, as discussed below, at trial, Arturo Fernandez refused to testify or answer any questions at all.  (RT 839-841.)  Thus, there simply was no testimony that the absent telephone records would have refuted.  Given these facts, Petitioner has failed to demonstrate his counsel's failure to obtain the telephone records in any way prejudiced his defense.

> 3.   Petitioner's claim that his counsel failed to investigate individual jurors' news subscriptions

Petitioner claims his trial counsel's performance was ineffective because she failed to investigate individual juror's subscription to local news publications which may have provided case facts to jurors prior to and contemporaneous with the trial.  (See Petition at 41.)  Petitioner contends that jurors knowledge of these facts would have prevented the jury from rendering an "impartial" verdict.  (See Petition at 41.)  Petitioner's claim fails for at least two reasons.

First, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Cox v. Del Papa, 542 F.3d 669, 679 (9th Cir. 2008), cert. denied, ___ U.S. ___, 129 S.Ct. 1403, 173 L.Ed.2d 610 (2009).  Here, Petitioner fails to provide any evidence of prejudicial news reports or publications which would have supported a need for inquiry into the juror's subscriptions to local news publications.  In fact as we noted above, the only media or news coverage noted in the record was an article published online by the Tulare Advance Register, on March 21, 2003.  (CT 329-30.)  As the Court has already stated, Petitioner received a fair trial following the Prosecutor's accurate statements published in the sole online account.

Second, even assuming Petitioner's counsel's further investigation would have shown jurors possessed knowledge of the case, the Court finds that Petitioner cannot establish prejudice on this ground.  "The Sixth Amendment right to a jury trial 'guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors.'" United States v. Sarkisian, 197 F.3d 966, 981 (9th Cir. 1999) (quoting Irvin v. Dowd, 366 U.S. 717, 722 (1961)). "[I]t is not required, however, that the

1   jurors be totally ignorant of the facts and issues involved." <u>Irvin</u>, 366 U.S. at 722-23 (finding that

2   mere existence of preconceived notion of guilt or innocence of accused is insufficient by itself to

3   rebut the presumption that a prospective juror is impartial).  Thus, even if juror members had

4   possessed prior knowledge of the case, such a finding would be insufficient to raise a colorable claim

5   of deficient performance or prejudice.

6          4.     Petitioner's claim regarding David Singh

7          Petitioner contends his counsel was also ineffective because she failed to "compel the

8   attendance" of David Singh at trial, to prove that David Singh had a conviction for a crime of moral

9   turpitude.  (See Petition at 41-42.)  Petitioner also contends that David Singh is a Fresno Police

10  Officer and that Mohinder Singh, one of the Prosecution's on-scene witnesses, provided reports to

11  this officer.   (See Petition at 41-42.)  Though, Petitioner's contentions regarding David Singh are not

12  entirely clear, the Court rejects Petitioner's assertions as speculative.  While it appears from the

13  record that on May 3, 2003, David Singh did assist an investigating officer in translating an interview

14  accomplished by the officer with store employee, Mohinder Singh (RT at 389),  Petitioner has not

15  provided: (1)  any evidence of the existence of David Singh's prior crimes of moral turpitude, and;

16  (2)  even if such crimes were committed, how this might have either prejudiced Petitioner's defense

17  or had any effect on the case.  Petitioner's unsupported assertions here are insufficient to support his

18  ineffective assistance of counsel claim.

19         5.     Failure to seek a writ of mandate following denial of his section 1118.1 motion

20         At the close of the prosecution's case, Petitioner moved for an acquittal pursuant to

21  California Penal Code section 1118.1 challenging the sufficiency of the Prosecution's evidence.  The

22  trial court denied Petitioner's motion.  (RT at 852.)  Though Petitioner, on direct appeal, did not

23  challenge the sufficiency of the evidence presented at trial, Petitioner contends his trial counsel was

24  ineffective in failing to seek a writ of mandate following the denial of his Section 1118.1 motion.

25         Preliminarily, as Respondent correctly points out, because a denial of a section 1118.1

26  motion may be reviewed on direct appeal, Petitioner had a plain, speedy and adequate remedy at law.

27  Thus the remedy of a writ of mandate would not have been available.  Cal.Code Civ. Proc. § 1086.

28  However, regardless of the means used to challenge the denial of his motion, Petitioner's claim lacks

1   merit.

2   "In ruling on a motion for judgment of acquittal pursuant to section 1118.1, a trial court

3   applies the same standard an appellate court applies in reviewing the sufficiency of the evidence."

4   People v. Cole 33 Cal.4th 1158, 1212-13 (2004).  A California Penal Code section 1118.1 motion

5   will be granted if there is no substantial evidence of each element of the offense charged sufficient to

6   find the defendant guilty beyond a reasonable doubt. Id. (citations omitted). When reviewing the

7   denial of a motion under section 1118.1, made at the close of the prosecution's case-in-chief, the

8   reviewing court, like the trial court, may consider only the evidence then in the record. People v.

9   Belton, 23 Cal.3d 516, 526-527 (1979).

10   Further, "unless a reviewing court determines that the corroborating evidence should not have

11   been admitted or that it could not reasonably tend to connect a defendant with the commission of a

12   crime, the finding of the trier of fact on the issue of corroboration may not be disturbed on appeal."

13   People v. Falconer, 201 Cal.App.3d 1540, 1543 (1988).  As stated by the California Court of Appeal:

14   Evidence that sufficiently corroborates an accomplice's testimony 'must tend to
    implicate the defendant and therefore must relate to some act or fact which is an
15   element of the crime[,] but it is not necessary that the corroborative evidence be
    sufficient in itself to establish every element of the offense charged.' The evidence
16   necessary to corroborate accomplice testimony need only be slight, such that it would
    be entitled to little consideration standing alone.  It is enough that the corroborative
17   evidence tends to connect defendant with the crime in a way that may reasonably
    satisfy a jury that the accomplice is telling the truth.  People v. Narvaez, 104
18   Cal.App.4th 1295, 1303 (2002) (citations omitted).

19   Here, given the evidence presented at trial, Petitioner has failed to show how any review of

20   the denial of his section 1118.1 motion would have been successful.  Petitioner's accomplices

21   testified that Petitioner shot the victim, Surjit Singh, during the course of the robbery.  (RT at 576-

22   577, 682-683.)  In support of the motion, Petitioner's counsel argued the accomplices' testimony had

23   been unreliable and that store employee Mohinder Singh had been less than 100 percent certain in

24   identifying Petitioner as the shooter.  (RT at 851-852.)  However, the Prosecution had presented

25   corroborating evidence which, consistent with the accomplice testimony, included: (1) the store's

26   security video which showed George Montanez both entering and exiting the store  (RT at 373, 586);

27   (2) Mohinder's Singh identification of George Montanez as the individual who entered and exited

28   the store, along with his less than 100 percent certain identification of Petitioner (RT at 528-529); (3)

photographs of the crime scene which, consistent with the accomplices' testimony, showed beer cans dropped at the scene (RT at 352-354); (4) eyewitness Tina Garcia's testimony that she had seen someone standing outside of the vehicle (RT at 435-436) and that shortly thereafter she witnessed "the guy that got shot . . . fall down." (RT at 438.)  Garcia also testified she saw the vehicle quickly drive away with its headlights off (RT at 437-438), and; (5) an additional eyewitness, Cynthia Mayo, testified she also saw a car traveling fast with its headlight off leaving the scene.  (RT at 454.)

After reviewing the record, the Court cannot say that the corroborating evidence should not have been admitted or that it could not reasonably tend to connect Petitioner to the crime charged. Given the evidence presented, Petitioner has failed to establish a reasonable probability that had his counsel brought timely appeal of the trial court's denial of his motion for acquittal, the result would have been different.

Accordingly, the Tulare County Superior Court's rejection of Petitioner's ineffective assistance of counsel claim was not objectively unreasonable and Petitioner is not entitled to relief on this claim.

### G.    Ground Eight: Petitioner's Claim that the trial court erred in allowing Arthur Fernandez to testify

Petitioner argues that the trial court erred in permitting the Prosecution to call Arthur Fernandez, Petitioner's Brother, who Petitioner asserts the Prosecution knew would not testify. Petitioner contends that the Prosecutor's sole purpose for calling Arthur was to allow the jury to witness his refusal to testify so as to encourage the jury to draw impermissible conclusions against Petitioner.

The California Court of Appeal is the last state court to issue a reasoned decision addressing this Petitioner's claim.  The Court adopts the following portions of the Court of Appeal's summation of facts regarding Arthur Fernandez's appearance:

A.  Pretrial Motions

On January 14, 2004, the court heard pretrial motions. . . The prosecutor stated he "absolutely" intended to call Arthur and explained the circumstances of his statement. Arthur had been in custody when he voluntarily initiated contact with Detective French with information about the murder.  Arthur received information from a relative's mother that appellant and Rudy were involved in the murder.  Arthur called both Rudy and appellant and, during the conversation appellant implicated himself in

the murder. Arthur made these telephone calls to the suspects on his own initiative and he did not act at the direction of the police. Arthur knew Detective French from previous contacts and voluntarily advised him of his telephone conversations with the suspects. Arthur stated that he was willing to give evidence against his family and hoped French would help him get paroled. The prosecutor acknowledge the police subsequently tried to set up a recorded telephone call between Arthur and Rudy, but it never happened. . . .

        . . . .

B. The Grant of Immunity

On February 3, 2004, the prosecutor began the case-in-chief with the testimony of the investigating detective, the pathologist, and two witnesses. Thereafter, the prosecutor stated his intent to call Arthur. Defense counsel renewed the motion to exclude Arthur's statement as being obtained as a result of promises and coercion. Defense counsel also wanted the court to determine, before Arthur appeared before the jury, whether Arthur intended to invoke his Fifth Amendment rights and refuse to testify. The prosecutor replied that Arthur had no right to refuse to testify. Defense counsel acknowledged that point, but argued the court should determine what was going to happen before Arthur appeared before the jury.

Thereafter, the court excused the jury and Arthur was sworn as a witness. Arthur testified he could not remember whether he previously spoke to officers, and he was not going to answer questions because he had nothing to say.

The court found Arthur did not have any Fifth Amendment privileges and intended to order him to testify, but anticipated that he would still refuse. The court also intended to find Arthur in contempt and order him "back to jail as punishment for contempt."

        . . . .

[Later but still outside the presence of the jury,] Arthur returned to the stand and again stated he would not testify. The court explained that he had no right to refuse to answer questions, and ordered him to answer. The prosecutor asked Arthur about his previous interview with the officers, and Arthur again said he would not answer. The court repeated its order two more times, and Arthur again refused to answer any questions. The court then advised Arthur that he would be held in contempt and placed in custody until he answered questions, and Arthur still refused to answer. The court found Arthur in contempt and remanded him to custody until he was prepared to answer questions. Thereafter, Arthur left the stand and the trial resumed before the jury with other witnesses.

On February 4, 2004, the court returned to the issue of Arthur's refusal to testify. The prosecutor relied on People v. Lopez (1999) 71 Cal.App.4th 1550 ( Lopez ), argued Arthur did not have a lawful privilege not to testify, "and the law states that he must do that, he must refuse to testify in the presence of the jury." The court reviewed Lopez and thought it was distinguishable. The prosecutor argued the jury was entitled to know that appellant's brother refused to testify against him, and again noted that Arthur seemed like he was going to testify until the previous day.

The court replied the jury did not have any "right" to hear particular evidence, but the question was whether the evidence was admissible. The court was troubled about "the prospect of a party asking a series of questions to which apparently, there will be no answer," which would not consist of any evidence, "and yet it's there before the trier

of fact." The prosecutor clarified that he would not ask leading questions and leave them "hanging out there." Instead, the jury would simply see that appellant's brother refused to testify against him. The court again said the jury did not have a right to hear such an exchange. The prosecutor argued the state and the victim had the right to call Arthur to the stand, and he must refuse to testify in the jury's presence because he was not invoking a lawful privilege. . . .

Defense counsel replied the prosecutor's proposed scenario was prejudicial and would contaminate the jury. Arthur's hearsay statements were not reliable, and Arthur's refusal to testify was also consistent with a desire not to perjure himself.

The court replied that it would not allow Arthur to be called before the jury "right now at this point of the trial."  The court wanted to think about the issue, and decided to appoint counsel to advise Arthur on the extent of his Fifth Amendment privileges. The court also decided "[o]ut of an abundance of caution" to retract the contempt finding and custody order because there might be a Fifth Amendment issue that it failed to consider. Thereafter, the court and the parties returned to the presentation of evidence.

On February 5, 2004, the court excused the jury and again considered Arthur's refusal to testify. Arthur was represented by counsel. The prosecutor called Arthur and he was sworn. Arthur testified appellant was his brother and he would not answer any questions, and his attorney clarified that Arthur invoked his privilege against self-incrimination.

The prosecutor advised the court that the People would grant immunity to Arthur for his testimony pursuant to section 1324. The court found that based on the entirety of the circumstances, "it does appear ... that [Arthur] might be put in a position of incriminating himself." The court signed the grant of immunity. The prosecutor suggested the jury should return to the courtroom as soon as he finished with Rudy's testimony. The court agreed and noted that Arthur was still under a subpoena.

Arthur's attorney requested to be excused, and the court agreed there was no further need for counsel because if Arthur was called as a witness, he had been granted immunity and did not have any more Fifth Amendment claims. Arthur's attorney agreed.

Defense counsel was concerned that if Arthur was called as a witness, he could still refuse to testify in front of the jury. The court noted Arthur had been granted immunity, the prosecutor could call him as a witness, he no longer had any valid Fifth Amendment claims, and he could be questioned in front of the jury. Defense counsel objected because it was prejudicial if the jury heard Arthur's repeated refusals to testify against his brother. Defense counsel asked that if the court permitted such a procedure, it should prohibit the prosecutor from asking the type of questions which "would suggest answers that he's not going to make." The prosecutor replied that he would not pose any leading, open-ended questions to Arthur in front of the jury.

Defense counsel next objected that appellant's due process rights would be violated by permitting Arthur to refuse to testify in front of the jury. There was no purpose to such a procedure, and no relevant testimony "that this display could be used to . . . augment or prove." The court rejected counsel's objection, and the trial continued with Rudy's testimony.

C. Arthur's Appearance before the Jury

After Rudy completed his testimony, defense counsel renewed her objection to calling Arthur in front of the jury because if he refused to testify, there would be "prejudicial inferences that . . . are just hanging in the air but are not provable," and such procedures violated appellant's due process rights. The court overruled appellant's objections.

Thereafter, the prosecutor called Arthur to the stand in the jury's presence and the following exchange occurred:

Q. Good afternoon, sir. What's your name?

A. Arthur Fernandez.

Q. Do you know a Daniel Fernandez?

A. Here we go again. I have nothing to say.

Q. I'm sorry?

A. I ain't talking to you. I have nothing to say.

Q. If I ask you any additional questions, are you going to answer?

A. No.

[THE PROSECUTOR]: Your Honor, [I] ask the court to instruct the witness to answer the questions.

THE COURT: All right. Mr. Fernandez, you are obligated to answer the questions. You've been subpoenaed as a witness. If you don't answer the-I am ordering you to answer the questions of counsel.

[BY THE PROSECUTOR]: [¶] Q. Do you know Daniel Fernandez?

THE COURT: Wait a minute. We need to start over. [¶] The record will reflect that one of the alternates was not seated.

[BY THE PROSECUTOR]: [¶] Q. Good afternoon, sir. What is your name?

A. I have nothing to say.

Q. Is your name Arthur Fernandez?

A. Yes, I am Arthur Fernandez.

Q. Do you know Daniel Fernandez?

THE COURT: Sir, you are ordered to answer the question.

[BY THE PROSECUTOR]: [¶] Q. Do you know Daniel Fernandez? [¶] Are you going to answer my questions?

A. No.

THE COURT: All right. Mr. Fernandez, do you understand that if you do not answer

1   the questions, you will be held in contempt of court?

2   THE WITNESS: Yes.

3   [BY THE PROSECUTOR]: [¶] Q. If I continue to ask you any more questions, you going to answer 'em?

4   A. Nope.

5

6   THE COURT: All right. Mr. Fernandez having been ordered to answer the questions, having been admonished that he would be held in contempt of court for refusing to answer the questions and having refused the questions, he's held in contempt, and he will be confined until he's ready to answer questions. . . ."

7

8   Thereafter, the trial continued with additional prosecution witnesses.

9   The court subsequently instructed the jury with the following special instruction, as requested by appellant:

10

11   "You are instructed that the fact that Arthur Fernandez refused to testify in this case is not evidence and may not be used by you in any way as evidence against [appellant]. Further, you are instructed that you must not speculate as to what he may have said or as to why he did not testify."

12

13   (See Resp't Lodged 4 at 13-20.)

14   In denying Petitioner's claim, the California Court of Appeal stated:

15   In the instant case, the court did not err when it permitted the prosecutor to call Arthur to the stand. The court carefully conducted a series of hearings outside the jury's presence to evaluate Arthur's invocation of the Fifth Amendment, reversed its earlier contempt order, appointed counsel to represent him on this question, and decided to grant him immunity. Once the court granted immunity to Arthur, he no longer had a constitutional or statutory right to refuse to testify, and the court properly allowed the prosecutor to call Arthur before the jury and briefly question him. (See, e.g., U.S. v. Romero 249 F.2d 371, 375. (2d Cir.1957).) The prosecutor was entitled to determine if Arthur would change his mind about testifying after the grant of immunity and once he was actually before the jury. Moreover, the prosecutor did not question Arthur about the substance of the testimony he wished to obtain, or ask leading questions in an effort to introduce inadmissible evidence before the jury. (See, e.g., Douglas v. Alabama 380 U.S. 415, 419-420 (1965); People v. Shipe 49 Cal.App.3d 343, 349-351. (1975).) Instead, the prosecutor simply asked Arthur if he would answer any questions, Arthur said no, and the witness was excused. In addition, the jury received a special instruction, very similar to CALJIC No. 2.25, that it could not regard such questioning as having evidentiary value. We must presume the jurors followed the instructions given to them. (People v. Adcox 47 Cal.3d 207, 253. (1988))

24

25   (See Resp't Lodged 4 at 23-24.)

26   Even presuming the trial court erred in admitting Arthur Fernandez refusal to testify,

27   Petitioner's claim lacks merit. A state court's evidentiary ruling is not subject to federal habeas

28   review unless the ruling violates federal law, either by infringing upon a specific federal

constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process.  See Pulley v. Harris, 465 U.S. 37, 41 (1984); Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (9th Cir. 1991).  Accordingly, a federal court cannot disturb a state court's decision to admit evidence on due process grounds unless the admission of the evidence was "arbitrary or so prejudicial that it rendered the trial fundamentally unfair."  Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995); see also Colley v. Sumner, 784 F.2d 984, 990 (9th Cir. 1986).  In addition, in order to obtain habeas relief on the basis of evidentiary error, petitioner must show that the error was one of constitutional dimension and that it was not harmless under Brecht, 507 U.S. at 623.  Thus, in order to grant relief, the habeas court must find that the error had "'a substantial and injurious effect' on the verdict.'" Dillard v. Roe, 244 F.3d 758, 767 n.7 (9th Cir. 2001) (quoting Brecht, 507 U.S. at 623).

No clearly established Supreme Court law provides that admission of a witness' testimony, who is likely to refuse to testify, violates due process.  The Ninth Circuit, in the similar context of evaluating whether to permit a witness with valid Fifth Amendment privileges to take the stand, has stated:

> It is not invariably reversible error to permit a witness who may refuse to testify to take the stand. The Supreme Court has focused on two factors helpful in determining when error has occurred. One of these factors deals with prosecutorial misconduct. The other rests upon the conclusion that, in a given case, "inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant."

Skinner v. Cardwell, 564 F.2d 1381, 1390 (9th Cir. 2007) (citation omitted).  Here, though Petitioner does not appear to have asserted prosecutorial misconduct, this Court agrees with the Court of Appeal's analysis which found the Prosecutor's conduct appropriate as he "did not question Arthur about the substance of the testimony he wished to obtain, or ask leading questions in an effort to introduce inadmissible evidence before the jury."  (See Resp't Lodged 4 at 23-24.)

Regarding Petitioner's claims of prejudice, even ignoring considerations of the status of any privilege possessed by Arthur Fernandez, Petitioner has not demonstrated "'a substantial and injurious effect' on the verdict." Dillard, at 767 n.7.  Just as the Ninth Circuit found in Skinner, "[t]he brevity of the questioning and the relative neutrality of the questions asked preclude a finding

1  that the defendant was unfairly prejudiced." Skinner 564 F.2d at 1390.  In addition, any harm

2  resulting from the witness' refusal to testify was properly cured by the trial court's prompt

3  instruction to the jury against the use of the testimony.  See Weinbaum v United States, 184 F2d 330,

4  331 (9th Cir. 1950) (addressing the prejudice resulting from a witness invoking his claim of privilege

5  not to testify and stating: "the prejudice, if any there be, was of such character that it might be cured

6  by an instruction to disregard"); U.S. v. Valdez-Soto, 31 F.3d 1467, 1473-75 (9th Cir. 1994) (finding

7  a mistrial was not required when witness answered only a few preliminary questions before refusing

8  to further testify and the court provided a strong curative instruction).

9          Finally assuming it was error to allow the jury to hear Arthur Fernandez' refusal to testify,

10  given the sufficiency of the evidence, the Court does not find the error to have had a substantial and

11  injurious effect or influence in determining the jury's verdict.  Brecht, 507 U.S. at 637; Fry v. Pliler,

12  551 U.S. 112, 120 (2007).  According to accomplice testimony adduced at trial, Petitioner, along

13  with George Montanez and Rudy Fernandez planned to make a "beer run" with Rudy driving the car

14  and George Montanez stealing the beer from the store; Petitioner told his accomplices that he would

15  "handle" any store employee that followed Montanez from the store; Petitioner's two accomplices

16  both testified that Petitioner shot Surjit Singh as he gave chase to Montanez exiting the store;

17  Mohinder Singh's testimony along with the store's security video confirmed Montanez as the

18  individual that stole the beer inside the store; though not 100 percent certain, Mohinder Singh

19  identified Petitioner as the individual standing next to the get away vehicle; eyewitness testimony

20  confirmed the location of the vehicle during the time of the robbery and shooting and that an

21  individual was seen standing outside of the vehicle as the victim was seen falling to the ground.

22  Though Petitioner's counsel argued that the accomplice testimony was unreliable, a federal habeas

23  court "faced with a record of historical facts that supports conflicting inferences must presume-even

24  if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in

25  favor of the prosecution, and must defer to that resolution." Davis v. Woodford, 333 F.3d 982, 992

26  (9th Cir. 2003).  This evidence was sufficient to support Petitioner's first degree murder conviction,

27  along with the special circumstances that the murder occurred during the commission of a burglary

28  and robbery where Petitioner discharged a firearm.  Petitioner therefore is not entitled to federal

U.S. District Court
E. D. California

1   habeas relief on this aspect of his claim.

2       **H.      Ground Nine: Petitioner's Challenge to the "Combined" Special Circumstance**
            **Instructions and Verdict Form**

3

4           In California, a jury must decide unanimously the truth of a special circumstance allegation.

5   See People v. Hughes, 27 Cal.4th 287, 368 (2002); Cal.Penal Code § 190.4. In Petitioner's case, the

6   trial court instructed the jury regarding the special circumstances of murder "in the course of a

7   robbery and/or the murder . . . was committed by the defendant while he was engaged in the crime of

8   burglary." (CT at 610-611.)   The pertinent verdict form permitted the jury to find true the allegations

9   that Petitioner committed the murder while "engaged in the commission of the crime of burglary

10  and/or robbery . . . ." (CT at 716.)

11          When the jury finished its initial deliberations, the clerk read the verdict form indicating that

12  the jury had found true the special allegation that the murder of Surjit Sing was committed by

13  defendant while engaged in the "commission of burglary and or robbery . . . ." (RT at 1176.)  Once

14  the verdict had been read, the court called for a sidebar and "asked the parties whether the jury

15  needed to clarify the alternative finding." (RT at 1178.)  Following this brief exchange the court

16  instructed the jury to resume deliberations to clarify the special allegation so that it was clear whether

17  the jury was unanimous in finding Petitioner had committed the murder while engaged in either a

18  burglary, a robbery, or both.  (RT at 1181-1182.)  Petitioner contends that because the court did not

19  also advise the jury of a fourth possibility, that the jury had not been unanimous on either felony, that

20  the jury was "not called upon to specifically resolve that issue." (See Petition at 61.)  Thus,

21  Petitioner contends that after the court ordered the jury to resume deliberations, the jury had been

22  confused to believe it was "past the unanimity hurdle." (See Petition at 59.)  Petitioner contends the

23  use of a "combined" allegation of " burglary and/or robbery" in the instructions and on the verdict

24  form, along with the court's additional instructions, violated Petitioner's alleged right to a separate,

25  unanimous verdict on each of the special circumstances allegations.  (See Petition at 57-59.)

26          The Court of Appeal rejected Petitioner's contention, ruling that the court's added

27  instructions properly informed the jury that there were two alternative special circumstance

28  allegations, and that the jury had to reach a unanimous verdict one or the other, or both.  (See Resp't

1 Lodged 4 at 35.)  The Court of Appeal stated: "[i]f the jury had been confused with the original set of

2 the instructions, the court's reinstructions clarified any possible confusion."  (See Resp't Lodged 4 at

3 35.)

4       Petitioner's contention fails for several reasons. First, to the extent Petitioner contends the

5 additional instructions violated Petitioner's alleged right to a unanimous verdict, Petitioner's claim

6 plainly lacks merit. "[A] state criminal defendant, at least in constitutional cases, has no federal right

7 to a unanimous jury verdict." Schad v. Arizona, 501 U.S. 624, 634 n.5, (1991); see Richardson v.

8 United States, 526 U.S. 813, 821 (1999) ("this Court has not held that the Constitution imposes a

9 jury-unanimity requirement."); see U.S. v. Ullah, 976 F.2d 509, 513 n.5 (9th Cir. 1992).

10       Second, as the Court of Appeal recognized, the instructions as a whole in the present case

11 clearly informed the jury that it had to make separate determinations on each special circumstance

12 allegation.  The court also separately defined the offenses of burglary and robbery.   (CT 612-618.)

13 The jury is presumed to have followed its instructions, both in rendering its verdict and in filling out

14 the verdict form. See Weeks v. Angelone, 528 U.S. 225, 226, (2000). In light of all of the

15 instructions, Petitioner has not shown a reasonable likelihood that the jury construed the instructions

16 or the verdict form to permit the jury to render a less-than-unanimous verdict on each of the special

17 circumstance allegations.

18       However, even if there is a constitutional error, a habeas petitioner is not entitled to relief

19 unless the instructional error "'had substantial and injurious effect or influence in determining the

20 jury's verdict.'" Brecht, 507 U.S. at 637 (quoting Kotteakos v. United States, 328 U.S. 750, 776

21 (1946)).  In other words, when a federal habeas petitioner challenges the validity of a state jury

22 instruction, the issue is "whether the ailing instruction by itself so infected the entire trial that the

23 resulting conviction violates due process." Estelle v. McGuire, 502 U.S. 62, 72 (1991); Clark v.

24 Brown, 450 F.3d 898, 904 (9th Cir. 2006), cert. denied, 549 U.S. 1027 (2006). The court must

25 evaluate the alleged instructional error in light of the overall charge to the jury. Middleton v. McNeil,

26 541 U.S. 433, 437, (2004); Henderson v. Kibbe, 431 U.S. 145, 154 (1977); Villafuerte v. Stewart,

27 111 F.3d 616, 624 (9th Cir. 1997), cert. denied, 522 U.S. 1079 (1998).

28       Given the evidence described above in Section III(G), the court's instructions, the jury's

1   clarified verdict form indicating that it had found the murder was committed while Petitioner was

2   engaged in the commission of both a burglary and a robbery, and that each juror, when separately

3   polled, indicated their unanimity as to each special circumstance, the jury necessarily concluded that

4   the murder occurred during the commission of both a burglary and a robbery.  Therefore, any alleged

5   error in the instructions was harmless under <u>Brecht</u>.

6       **I.      Ground Ten: Petitioner's Challenge to the Penal Code Section 12022.53(D)**
            **Enhancement.**
7

8       Petitioner was convicted of first degree murder with special circumstances and sentenced to

9   the indeterminate term of life in prison without the possibility of parole.  Additionally, given the

    jury's finding that Petitioner personally and intentionally discharged a firearm resulting in death, the
10
    court imposed a consecutive term of 25 years to life pursuant to California Penal Code section
11
    12022.53, subdivision (d).  Petitioner claims that the trial court erred in its imposition of the
12
    consecutive term as authorized under section 12022.53, subdivision (d) because under section
13
    12022.53 subdivsion (j), enhancements authorized under 12022.53 are to be imposed, "unless
14
    another provision of law provides for a greater penalty."  Pen. Code § 12022.53 (j).
15
        At the time that it issued the last reasoned state decision regarding Petitioner's claim, the
16
    California Court of Appeal recognized a split in authority between the courts of appeal regarding an
17
    apparent conflict between section 12022.53 subdivisions (d) and (j), however the Court of Appeal
18
    found Petitioner's sentence proper.  (<u>See</u> Resp't Lodged 4 at 39.)
19
        Respondent argues that Petitioner's claim must fail because he does not claim a constitutional
20
    violation in any of his federal or state habeas petitions. The Court agrees.
21
        Federal habeas relief under section 2254 is available "only on the basis of some transgression
22
    of federal law binding the state courts. It is unavailable for alleged error in the interpretation or
23
    application of state law." <u>Wynn v. Bunnel</u>, 12 F.3d 1111 (9th Cir. 1993) (quoting <u>Middleton v.</u>
24
    <u>Cupp</u>, 768 F.2d 1083, 1085 (9th Cir. 1985)); <u>Engle v. Isaac</u>, 456 U.S. 107, 119 (1982).
25
        Petitioner does not specify which of his constitutional rights have allegedly been violated nor
26
    does he cite to any federal case law as authority supporting the position that this claim contains a
27
    federal question. Also, the Court has found no clearly established federal law governing the authority
28

provided to a state court under its own sentencing statutes. Accordingly, Ground Ten is not cognizable on federal habeas review.

### J.       Ground Eleven: Petitioner's Claims Regarding The Proper Presentence Custody Credits

Petitioner claims that the trial court erred in determining his actual presentence custody by crediting him 733 days when the actual number of days he should have received was 734.[11]  See Petition at 67.  Petitioner's claim is moot, as the California Court of Appeal granted Petitioner relief with respect to this claim.  People v. Daniel Carmen Fernandez, No. F045958, 2005 WL 2660057 at *25 (Cal. Ct. App. Oct. 19, 2005).

### RECOMMENDATION

Accordingly, the Court RECOMMENDS that:

1.       The petition for writ of habeas corpus be DENIED WITH PREJUDICE; and

2.       The Clerk of the Court be DIRECTED to enter Judgment for Respondent; and

3.       A Certificate of Appealability be DENIED.

This Findings and Recommendation is submitted to the Honorable Oliver W. Wanger, United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(c).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

---

[11] The Court notes Petitioner error in requesting (See Petition at 68) 735 days versus 734 days, as Petitioner himself states that the number of days he was in custody was "actually 734." (See Petition at 67-68.)

IT IS SO ORDERED.

**Dated:   December 17, 2010          /s/ John M. Dixon**
UNITED STATES MAGISTRATE JUDGE